# **EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement") is entered into as of October 6, 2006 by and between **Graham Capital Management, L.P.**, a Delaware limited partnership, with its principal place of business located at 40 Highland Avenue, Rowayton, Connecticut (the "Company"), and **Steve Bongiovanni** residing at 100 Henderson Rd, Williamstown, MA (the "Employee").

WHEREAS, the Company desires to employ the Employee in accordance with the terms and conditions set forth below; and

WHEREAS, this Agreement has been mutually discussed and is mutually desired by the parties;

NOW, THEREFORE, in consideration of the conditions and mutual covenants contained herein, the parties agree as follows:

1. **Employment.** The Company hereby employs the Employee, and the Employee hereby accepts employment, upon the terms and conditions contained herein. The Employee shall engage in research support and such other functions on behalf of the Company as are from time to time assigned to the Employee by the Chairman of the Company or his designee, all in a manner consistent with all applicable laws and regulations, any code of ethics, compliance manual, employee handbook or other oral or written internal procedures as may be adopted by the Company from time to time, and subject to such oral or written directives as shall be specified by the Company from time to time.

2. **Term of Employment.** The term of this Agreement shall commence no later than November 16, 2006 and shall continue until terminated pursuant to paragraph 10 below. The Employee understands that nothing in this Agreement is intended to or should be construed as providing the Employee with any right to continued employment with or by the Company or any of its affiliates. The Employee acknowledges that the Employee is and shall continue to be an at-will employee of the Company for all purposes who may be terminated by the Company or the Employee, for any reason, with or without cause and at any time, as set forth herein.

3. **Scope of Responsibilities.** The Employee agrees to devote the Employee's full and exclusive business time, attention, efforts and energies toward the performance of the duties and responsibilities under this Agreement. Unless the Employee receives prior written approval from the Company, the Employee agrees that while employed by the Company, the Employee will not engage in any employment or commercial endeavor other than for the Company, will not engage in any conflicting activities, will not have any financial interest, directly or indirectly, in any business or entity competing with the Company or otherwise engaged in the financial industry and will not develop or trade for the Employee or for any other person or entity any trading programs that generate instructions to trade securities, commodities or derivative instruments. The foregoing shall not be construed as preventing the Employee from passively investing in publicly traded securities in a manner consistent with the Company's Code of Ethics and other policies of the Company; provided, however, that such investments will not require services on the part of the Employee.

4. **Compensation.**

(a) The Company shall pay to the Employee an annual salary of US$145,000 during the term of this Agreement, payable bi-weekly in arrears in accordance with the payroll practices of the Company as from time to time in effect. In making all payments pursuant to this paragraph 4, the Company may withhold such taxes and other charges as may be required to be withheld by applicable United States federal, state and local law or regulation.

(b) The Employee shall be eligible to receive an annual bonus based on the performance of the Employee and the Company as determined by the Company in its sole and absolute discretion during each annual period ending on or about December 31; provided, however, that the 2006 annual bonus (which bonus the Company shall pay to Employee unless Employee either resigns or is discharged by the Company with Cause pursuant to paragraph 10(d) prior to December 31, 2006) shall be no less than an amount equal to US$43,500. Except as otherwise provided in this Agreement, the Employee must be in service on the date of payment to be eligible to receive an annual bonus.

(c) The Employee shall be entitled to and shall receive other benefits during the term of employment pursuant to the terms and conditions of the insurance and retirement plans and programs and other personnel policies that the Company may maintain for the benefit of its employees from time to time during such term.

**(d) The Employee understands that clauses a, b and c of this paragraph 4 contain the entire agreement and understanding between the Company and the Employee relating to the Employee's compensation. The Employee acknowledges that no oral or written agreements and understandings or alleged agreements or understandings heretofore made relating to the Employee's compensation or other terms and conditions of Employee's employment shall be enforceable against the Company. The Employee acknowledges that no oral or written statements or alleged statements hereafter made relating to the Employee's compensation shall be enforceable against the Company unless made in writing and signed by the Employee and the Chairman or Chief Executive Officer of the Company. The Employee hereby waives, and covenants not to sue on the basis of, any law (statutory, common law or otherwise) relating to the Employee's compensation which is or may be inconsistent with this paragraph 4.**

5. **Registration and Licensing.** The Employee acknowledges that the policies of the Company may require the Employee to be registered and/or licensed under various federal or state laws and regulations. The Employee agrees to obtain the necessary registrations and licenses. In the event that the Employee fails to obtain any necessary registration and/or license, or any necessary registration and/or license is denied, revoked or suspended, the Company shall be entitled to terminate this Agreement for Cause.

6. **Non-Disclosure of Confidential Information.** (a) The Employee agrees that, by virtue of the Employee's position of trust and involvement in the most confidential activities of the Company during the term of employment, the Employee will have access to, come into possession of, and otherwise become familiar with, confidential information and trade secrets relating to the business of the Company. The Employee agrees that such confidential information and trade secrets are the sole and exclusive property of the Company. In consideration of, and as a condition to Employee's access to such confidential information and trade secrets, the Employee further agrees that, during the term of employment, and at all times following termination of employment, the Employee will hold in a fiduciary capacity solely for the benefit of the Company and will not communicate, divulge, discuss, use, furnish, disclose, or make accessible to anyone such confidential information and trade secrets other than in the ordinary course of the Employee's work for the Company. Employee agrees to take reasonable steps to assure that such confidential information and trade secrets are stored securely on the premises of the Company and not to remove or send any such information from the premises of the Company without the express written consent of the Company. For the purposes of this Agreement, confidential information and trade secrets shall include, without limitation, proprietary investment and trading models, programs and systems and the underlying and associated design, source code, documents, data files, investment strategies, trading system rules, risk management techniques, algorithms, mathematical equations used to design trading strategies, and other information of a confidential nature (whether written or oral, contained in computer files or software, or otherwise) relating to or concerning the business, operations, management, services, products, activities or affairs of the Company, including client lists and client names. Such confidential information also includes information about the usefulness or other properties of trading strategies and information about the financial position, investments, strategies or trades of the Company and its affiliates and clients or services performed for any of them, or information relating to the Company's internal financial affairs (such as matters relating to the financial arrangements it has with the funds or clients to which it provides portfolio management and investment related services, the revenues and expenses associated with the operation of its business and similar matters), its employment and recruiting processes and strategies, the compensation, personal information, skill-set and experience of its personnel, and the sources of its investment capital. Confidential information shall not include information or trade secrets which the Employee can demonstrate: (i) was independently developed by the Employee without any use of the Company's confidential information; (ii) became known to the Employee, without restriction, from a source other that the Company that had no duty of confidentiality with respect to such information; or (iii) was in the public domain at the time it was disclosed or becomes in the public domain at the time it was disclosed or becomes in the public domain through no act or omission of the Employee. Employee agrees that Employee will not misappropriate any Company trade secrets or confidential information for Employee's own use or on behalf of any other person. The terms "misappropriate" and "trade secrets" shall have the same meaning as in the Connecticut Uniform Trade Secrets Act. For a period of five (5) years following the termination of this Agreement, the Employee shall immediately notify the Company in writing of the names and addresses of any persons or entities with whom the Employee is employed, associated or related in a business capacity, whether as shareholder, principal, agent, partner, officer, director, employee, independent contractor, consultant, licensor, lessor, seller or otherwise, and such notice shall specify the nature of the business of such person or entity and the nature of the

positions or functions to be performed for it (collectively, the "Notification Data"). For a period of five (5) years following the termination of this Agreement, the Employee agrees to represent to the Company upon the Company's request that Employee is not using any confidential information or trade secrets of the Company as described in this paragraph 6.

(b) Upon termination of employment, the Employee agrees to return to the Company all Company documents, papers, records, computer programs, software or other material, or copies of such material, in whatever form, in the possession or under the control of the Employee, including materials which may contain or from which may be derived confidential information and trade secrets, together with all equipment, documents, notes, keys, codes or other work product or property which is connected with or derived from the Employee's services to the Company and all copies thereof in whatever form.

(c) All work product of the Employee produced during the period of employment shall belong exclusively to the Company and shall be considered the confidential information of the Company, regardless of whether it is performed during regularly scheduled working hours or at the premises of the Company, and the Employee hereby assigns to the Company all of the Employee's rights therein without further compensation. Such work product shall include, but not be limited to, documents, data files, investment strategies, trading system rules, risk management techniques, algorithms, mathematical equations used to design trading strategies and the like. To the extent any such work product is protected by copyright, that product will be a work made for hire under the copyright laws of the United States. Employee waives all moral rights to all work developed or produced by Employee, including without limitation any and all rights of identification and authorship and all rights of approval, restriction or limitation on use of subsequent modifications. Nothing herein shall be construed to prevent the Employee from developing (either alone or in conjunction with others) the Employee's own independently developed systems following the termination of this Agreement, provided that the systems do not derive from or incorporate any confidential information or trade secrets of the Company and are not similar to any confidential information or trade secrets of the Company. If within the Applicable Period (as defined below) following termination of this Agreement the Employee wishes to use (either alone or in conjunction with others) or disclose to anyone what the Employee asserts is an independently developed trading system, the Employee agrees to make available to an independent expert reasonably acceptable to the Company, the Employee and, if any, the Employee's then current employer, the trading system(s) for analysis, which expert shall agree to hold confidential, subject to a written confidentiality agreement in form and substance reasonably acceptable to the Company, the Employee and if any, the Employee's then current employer. The term "Applicable Period" shall mean the number of years equal to the number of years of the Employee's employment with the Company, but in no case less than two (2) years or more than five (5) years. The Company's expert shall have thirty (30) days within which to review the system and advise the Company as to whether it considers the system in any way to infringe upon the Company's confidential information or to have been derived from or to incorporate the Company's trade secrets and confidential information. The Company shall have fifteen (15) days thereafter to notify Employee as to whether the Company believes the system in any way to infringe upon the Company's confidential information or to have been derived from or to incorporate the Company's trade secrets and confidential information. If the parties cannot agree as to whether the system infringes upon the Company's confidential information, the Company may seek injunctive relief and other relief as provided for herein. In any event, the post-termination use or disclosure of trading system(s) by, at the direction of or with the participation of the Employee shall be subject to any restrictions set forth in paragraph 8 of this Agreement.

(d) The Company acknowledges that Employee has intellectual property that Employee has developed prior to coming to the Company ("Employee Intellectual Property") and that Employee retains all ownership or other rights to such property unless and until that property is deployed for the Company. The Employee shall inform the Company whenever Employee discovers any overlap at the Company between Company intellectual property and Employee Intellectual Property; the Company may seek reasonable evidence of the overlapping Employee Intellectual Property to support Employee's claim of its independent existence. The Employee agrees to inform the Company in writing prior to Employee's disclosure to the Company of Employee Intellectual Property or Employee's use of Employee Intellectual Property on the Company's behalf in order to provide the Company the opportunity to determine whether or not the Company wishes to make use of such property. Should the Company decide to make use of any such Employee Intellectual Property, it will enter into a written contract with Employee (and, to the extent that the Company reasonably believes a third party may have any interest in such Employee Intellectual Property, such third party as a party thereto) at such time and pay reasonable compensation therefor. The Company agrees to keep confidential whatever Employee Intellectual Property has been disclosed to it that it does not use. In any event, the post-termination use or disclosure of Employee Intellectual Property by, at the direction of or with the participation of the Employee shall be subject to any restrictions set forth in paragraph 8 of this Agreement.

7. **Non-Solicitation.** For a period of two (2) years after termination of this Agreement, the Employee shall not, for the Employee's own benefit or the benefit of any other person or entity with which the Employee may hereafter be an officer, director, shareholder, agent, partner, independent contractor or consultant, or affiliated in any other capacity: (i) solicit or accept (directly or indirectly) the securities investment or commodity trading advisory business of any person or entity (including any affiliate of such a person or entity) who is (or is negotiating to become) a client of the Company or its affiliates at the time of such termination or has been such a client at any time within the eighteen-month period preceding such termination; (ii) solicit, cause, induce, influence or accommodate (directly or indirectly) any employee or agent of the Company or its affiliates to leave his or her employment or engagement with the Company or such affiliate in order to become an employee, agent, independent contractor, consultant or partner with any other person or entity with which the Employee is then, or may be contemplating to be, affiliated in any manner; (iii) hire or engage in any capacity any employee of the Company or its affiliates or any person who has been an employee of the Company or its affiliates within the eighteen-month period preceding such termination; or (iv) otherwise interfere in any way with the relation of the Company and any of its clients or employees.

The Employee acknowledges that the Employee is fully knowledgeable of the effect of non-disclosure and non-solicitation provisions and agrees and stipulates that the agreements and covenants contained in the preceding paragraphs 6 and 7 are fair and reasonable in light of all of the facts and circumstances of the relationship between the Employee and the Company. Furthermore, Employee acknowledges that the special bonus and severance arrangements provided Employee under this Agreement are consideration for the covenants in paragraphs 6, 7 and 8. The Employee recognizes the international scope of the Company's business and the unique nature of the Employee's services. In the event that any of the provisions of this Agreement are deemed to be unreasonable by a court of competent jurisdiction, the Employee agrees to abide by and submit to any reduction of such limitation as the court deems reasonable.

8. **Non-Competition.** (a) The Employee acknowledges that the Employee both provides the Company with unique services and skills and occupies a position of trust and agrees that for a period of two (2) years following termination of this Agreement, the Employee shall not become a securities or commodities trading advisor located or trading on any exchange located in the Restricted Territory (as defined below), or engage, directly or indirectly, or through any corporations or associates (including, but not limited to, as a shareholder, principal, agent, partner, officer, director, employee, independent contractor, consultant, licensor, lessor or seller), in any business, enterprise or employment, located or trading on any exchange located in the Restricted Territory, that is competitive with, or engaged in activities similar to, those activities in which the Company is engaged (including, but not limited to, hedge funds or entities engaging in proprietary trading or activities similar to that of the Company), provided however, that if the Employee is terminated by the Company without Cause pursuant to paragraph 10(c), the Employee may engage in competitive activities within the meaning of this paragraph 8 following the termination of employment unless the Company continues to pay Employee one hundred percent (100%) of the Employee's annual salary as at the time of such termination (subject to any withholding required by law and the Company's payroll practices then in effect) for a period not to exceed two (2) years following such termination. The term "Restricted Territory" means any of the following countries or their states, provinces, territories or possessions: Organization for Economic Co-Operation and Development ("OECD") members as of the date of this Agreement; countries admitted as OECD members after the date of this Agreement; other European countries; Peoples Republic of China; Republic of China; Singapore; Russia; India or Israel.

(b) If following termination of this Agreement the Employee wishes to become affiliated with an enterprise engaged in the securities or futures business in a manner that the Employee asserts is not in violation of the terms of this Agreement, the Employee agrees to provide to the Company in writing the Notification Data with respect to such proposed affiliation. For the avoidance of doubt, activities in violation of paragraph 8(a) shall include acts that evidence, threaten or otherwise prepare for the formation of a competitive entity or engagement in a competitive activity as specified therein. The Company shall have ten (10) days within which to review such Notification Data and advise the Employee as to whether (and subject to what conditions) it considers the proposed affiliation to comply with the Employee's obligations under this Agreement. If the parties cannot agree, the Company may seek injunctive relief and other relief as provided for herein.

(c) The Employee acknowledges that the Employee is fully knowledgeable of the effect of a non-competition provision and agrees and stipulates that the agreements and covenants not to compete contained in the preceding paragraphs and this paragraph are fair and reasonable in light of all of the facts and circumstances of the relationship between the Employee and the Company. The Employee recognizes the international scope of the Company's business and the unique nature of the Employee's services. In the event that the non-

competition provisions of this Agreement are deemed to be unreasonable by a court of competent jurisdiction, the Employee agrees to abide by and submit to any reduction of such limitation as the court deems reasonable. If the Employee violates the non-competition restrictions of this Agreement, then the temporal nature of such non-competition restrictions will last for two years from the time the Employee has permanently stopped violating it.

(d) The Employee agrees and acknowledges that in the event of the termination of this Agreement, the Employee is capable of obtaining employment in business activities which are of a different or non-competing nature with the Employee's activities as an employee of the Company and that the enforcement of a remedy by way of injunction shall not prevent the Employee from earning a reasonable livelihood. The Employee further acknowledges and agrees that, in view of Employee's relationship of trust with the Company and Employee's importance to the business of the Company, the covenants contained herein are necessary for the protection of the Company's legitimate business interests and are reasonable in scope and content.

(e) The Employee will provide periodic certifications, at the Company's request, acknowledging the Employee's responsibilities and obligations under this Agreement and affirming the Employee's compliance therewith.

9. **Representations and Warranties**. The Employee represents and warrants to the Company as follows:

(i) The resume provided by the Employee and attached hereto as Schedule A and the employment application completed, and provided the Company, by the Employee does not contain any misleading or untrue statement or omit to state any fact necessary to make the statements therein not misleading;

(ii) The Employee is a citizen or legal resident of the United States of America with authorization to perform services for the Company and has furnished the Company with documentary proof of such status;

(iii) The Employee is currently unaware of, and has never been the subject of, any investigation or subject to any disciplinary action of any government agency, industry self-regulatory body or former employer relating in any way to the Employee;

(iv) That the execution, delivery and performance of this Agreement by the Employee and the Employee's participation in the Company's business will not violate (x) the terms, including any non-competition, non-disclosure, non-solicitation or confidentiality provisions, of any written or oral agreement, arrangement or understanding to which the Employee is a party or by which the Employee is bound or (y) any United States federal, state or foreign statute, rule, governmental regulation or other law, or any judgment, decree or order applicable to or binding upon the Employee;

(v) Employee has provided the Company with accurate copies of all such documents referenced in subparagraph 9(iv) above; and

(vi) Employee shall not bring to the premises of the Company or use in the performance of Employee's duties for the Company any software not properly licensed to the Company or any confidential information, trade secrets or property of any prior employer or other person.

10. **Termination**. (a) Death. If the Employee dies during the term of this Agreement and while in the employ of the Company, this Agreement shall automatically terminate and the Company shall have no further obligation to the Employee or the Employee's estate, except that the Company shall pay the Employee's estate that portion of the Employee's base salary under paragraph 4(a) of this Agreement accrued through the date on which the Employee's death occurred and no further compensation.

(b) Disability. If during the term of this Agreement, the Employee is unable or fails to perform the duties and responsibilities hereunder for a continuous period of three (3) months, or during any six (6) month period is unable or fails to perform the duties and responsibilities hereunder for a total of ninety (90) days, whether consecutive or not, as a result of disability, incapacity, physical or mental illness, or any other causes beyond the Employee's control, then the Company may terminate this Agreement upon five (5) days' written notice to the Employee or payment of salary in lieu thereof. For purposes of this Agreement, the Employee shall be deemed to have become disabled, without limitation, when the Company, upon the advice of a qualified physician,

shall have determined that the Employee has become physically or mentally incapable (excluding infrequent and temporary absences due to ordinary illness) of performing the Employee's duties under this Agreement. In the event of a termination pursuant to this paragraph 10(b), the Company shall be relieved of all its obligations under this Agreement, except that the Company shall pay to the Employee, or the Employee's estate in the event of subsequent death that portion of the Employee's base salary under paragraph 4(a) of this Agreement accrued through the date on which such termination shall have occurred and no further compensation.

(c) Discharge Without Cause. At any time during the term of this Agreement, the Company may discharge the Employee for any reason, without Cause (as defined in paragraph 10(d) below) and without prior notice, and terminate this Agreement without any further liability hereunder to the Employee or the Employee's estate other than to pay to the Employee (or the Employee's estate in the event of subsequent death): (x) that portion of the Employee's base salary under paragraph 4(a) through the date of discharge, plus (y) the additional payment of base salary specified in paragraph 8(a) unless the Company in its sole and absolute discretion decides to waive its rights to enforce the non-competition provision contained in paragraph 8(a), and (z) no further compensation.

The Employee acknowledges that the Company has the absolute right and ability to terminate the Employee at any time and for any reason by agreeing to pay the Employee (or the Employee's estate in the event of subsequent death) under clauses (x) and (y) of this paragraph 10(c) or, in the event of death or disability, paragraphs 10(a) and (b), respectively, of this Agreement (the "Severance Payment"). The Employee agrees that such Severance Payment is additional consideration for the covenants in paragraphs 6, 7 and 8, is in addition to anything of value to which the Employee is entitled and is intended by the parties to, shall constitute a full and final settlement and satisfaction of any and all amounts that the Company may then owe the Employee or the Employee's estate under this Agreement for compensation of whatever nature whatsoever and that, upon payment by the Company of the Severance Payment to the Employee or the Employee's estate, the Company and its affiliates and employees shall be released by the Employee from any and all claims of any nature whatsoever which the Employee may have against the Company or any of its affiliates or employees under this Agreement or otherwise, including, without limitation, any claims for salary, bonus, benefits, severance or other compensation or any claims relating to the termination by the Company of this Agreement. The Employee (or the Employee's estate in the event of subsequent death) shall be required to execute and deliver a release to the foregoing effect in a form reasonably satisfactory to counsel for the Company as a condition precedent to paying the Severance Payment.

(d) Discharge for Cause; Resignation. Prior to the end of the term of this Agreement, the Company may discharge the Employee for Cause and terminate this Agreement immediately and without prior notice. In such case, or in the event of the Employee's resignation, this Agreement shall automatically terminate and the Company shall have no further obligation to the Employee or the Employee's estate other than for earned but unpaid base salary under paragraph 4(a). For purposes of this Agreement, the Company shall have "Cause" to discharge the Employee and terminate the Employee's employment hereunder upon: (i) the Employee's dishonesty or gross, willful or persistent disregard of the Employee's duties and responsibilities hereunder; (ii) the Employee's failure or refusal to follow policies or directives established by the Chairman of the Company or his designee; (iii) the Employee's failure or refusal upon any request by the Company to certify in writing the Employee's compliance with the Company's policies for the protection of its confidential information; (iv) trading errors due to gross negligence; (v) breach of fiduciary duty or the duty of loyalty theft, embezzlement, fraud, extortion or other criminal activity; (vi) alcohol abuse that interferes in any manner with the performance of Employee's duties; (vii) illicit drug use or addiction to legal or illegal drugs; (viii) material breach of any terms of this Agreement or any threat thereof; (ix) inaccuracy in a material respect of any representation or warranty contained in this Agreement; (x) private, personal, public or business conduct by the Employee which, in the reasonable judgment of the Company, is materially detrimental to the interests, image or reputation of the Company or which is reported in the general or trade press and which is scandalous, immoral or illegal; or (xi) a material violation of any applicable laws, rules, regulations, or policies of the Company or any threat thereof.

11.     **Counterparts.** This Agreement may be executed in multiple original counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.     **Enforcement.** The Company and the Employee hereby submit to the exclusive jurisdiction of the courts of the State of Connecticut and the federal courts of the United States of America located in such state within Fairfield County. In the event of a breach or threatened breach by the Employee of paragraph 6, 7 or 8 of this Agreement, the Employee hereby expressly (i) agrees that the Company would suffer irreparable harm which may not be adequately compensated by money damages; (ii) agrees that the Company shall be entitled to an injunction, specific performance and other equitable relief to prevent a violation of the terms and conditions of this Agreement; and (iii) waives any requirement for the securing or posting of any bond in connection with the obtaining of any such relief. If the Company prevails in any suit brought to enforce its rights under this Agreement, the Employee shall reimburse the Company for its expenses, including costs and attorneys' fees,

incurred in connection with such a suit. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach, including the recovery of damages from the Employee or other persons. The Company and the Employee agree not to assert that any action brought in such courts have been brought in an inconvenient forum.

13. **Enforceable Agreement.** Paragraphs 6, 7 and 8 of this Agreement shall be enforceable notwithstanding the existence of any claim or cause of action of the Employee against the Company whether predicated on this Agreement or otherwise. To the extent that paragraphs 6, 7 or 8 are determined by a court of competent jurisdiction to be unenforceable for any reason as drafted, the parties agree that the court making such determination shall have the power to adjust such provision and, as so altered, such provisions shall be enforceable.

14. **No Acts Contrary to Law.** Nothing contained in this Agreement shall be construed to require the commission of any act contrary to any law, rule or regulation.

15. **Partial Validity.** All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative, and no one of them shall be in limitation of any other remedy, right, undertaking, obligation, or agreement of either party hereto. No provision of this Agreement shall be deemed dependent on any other provision unless expressed herein. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable by reason of any rule of law or public policy, all other provisions of this Agreement shall nevertheless remain in effect.

16. **Notices.** All notices and demands of every kind shall be personally delivered to the parties' residential or business addresses or at such other addresses as either party may designate in writing, delivered or mailed in accordance with the terms of this Agreement. Any such notice or demand shall be in writing and shall be effective immediately upon personal delivery or three (3) days after deposit in the United States mail, as the case may be.

17. **Choice of Law.** This Agreement shall be governed by and shall be construed in accordance with the laws of the State of Connecticut without reference to its conflict of laws rules.

18. **Successors and Assigns.** The Employee's rights and obligations under this Agreement inure to the benefit of the Employee and are binding upon the Employee and the Employee's heirs, executors, administrators, and legal representatives. The Employee's rights, duties or obligations hereunder are not assignable. The Company's rights and obligations under this Agreement inure to the benefit of the Company and are binding upon the Company and its successors, permitted assigns, and legal representatives. The Company may transfer any of its rights, duties or obligations hereunder without the approval of the Employee only to an affiliate of the Company or the purchaser of all or a significant portion of the assets of the Company.

19. **Entire Agreement.** This Agreement (including Schedule A hereto) contains the entire agreement and understanding between the parties to it and supersedes any and all oral or written agreements and understandings heretofore made relating to the Employee's employment. The submission by the Company of this Agreement in unsigned form shall be deemed to be a submission solely for Employee's consideration and not for acceptance and execution. Such submission shall have no binding force and effect, shall not constitute an option, and shall not confer any rights upon Employee or impose any obligations upon the Company irrespective of any reliance thereon, change of position or partial performance. The submission by the Company of this Agreement for execution by the Employee and the actual execution and delivery thereof by the Employee to the Company shall similarly have no binding force and effect on the Company unless and until the Company shall have executed this Agreement and a counterpart thereof shall have been delivered to the Employee.

20. **Amendments.** No amendments or modifications of the terms and conditions of this Agreement shall be effective unless made in writing and signed by the Employee and a duly authorized representative of the Company.

21. **Waiver.** A non-written waiver of any term or condition of this Agreement shall not be construed as a general waiver by the Company, and the Company shall be free to reinstate any such term or condition with or without prior notice to the Employee.

22. **Captions.** The captions of this Agreement are inserted for convenience only.

23. **Survival.** Paragraphs 6, 7, 8 and 12 of this Agreement shall survive the termination of this Agreement.

24. **Opportunity to Consult Attorney.** The Employee acknowledges that the Employee has hereby been advised in writing of the Employee's right to consult with an attorney prior to signing this Agreement and that in fact the Employee has had sufficient opportunity to seek legal advice regarding the terms of this Agreement.

AS STATED IN PARAGRAPHS 4(d) AND 19, THIS AGREEMENT CONTAINS THE EXCLUSIVE TERMS RELATING TO THE EMPLOYEE'S COMPENSATION BY THE COMPANY.

THE COMPANY MAY DISCHARGE THE EMPLOYEE FOR ANY REASON, WITHOUT CAUSE AND WITHOUT PRIOR NOTICE, AND TERMINATE THIS AGREEMENT WITHOUT LIABILITY OTHER THAN FOR THAT PORTION OF THE EMPLOYEE'S BASE SALARY UNDER PARAGRAPH 4(a) ACCRUED THROUGH THE DATE OF DISCHARGE PLUS ANY AMOUNT REQUIRED BY PARAGRAPH 10(c)(y).

IN WITNESS WHEREOF, this Employment Agreement has been executed by the Company and the Employee as of the date first set forth above.

COMPANY:

GRAHAM CAPITAL MANAGEMENT, L.P.

By _____
Paul Sedlack, Chief Executive Officer

EMPLOYEE:

_____
Steve Bongiovanni

STATE OF CONNECTICUT       )
                           ) ss.: Rowayton
COUNTY OF FAIRFIELD        )

On this 20th day of October, 2006, before me, the undersigned officer, personally appeared Paul Sedlack, who acknowledged that he is the Chief Executive Officer of Graham Capital Management, L.P., and who represented that he was authorized to execute the foregoing Agreement and did execute the foregoing Agreement on behalf of Graham Capital Management, L.P.

My Commission Expires: 04/30/08

_____
Notary Public

**Emiko Takeno**
**NOTARY PUBLIC**
State of Connecticut
My Commission Expires 04/30/08

STATE OF Massachusetts   )
                         ) ss.:
COUNTY OF Berkshire      )

On this 20 day of October, 2006, before me, the undersigned officer, personally appeared Steve Bongiovanni, who before me subscribed and swore to such person's voluntary execution of the foregoing Agreement.

My Commission Expires: 10.13.2011

_____
Notary Public
Brigit C. Connerton

Schedule A – Resume
**Steve Bongiovanni**

*QUALIFICATIONS*
- In-depth knowledge of market data ranging from tracking SecurityMaster and CAX data to TAQ data to full Level 2 data. Market data exposure spans 47 countries. (L2 for USA only)
- Expert in limit order book (and other high frequency datasets) processing and analysis including direct exchange feed handling, filtration and side classification, statistics generation, and production of models.
- Architect level development skills. Extensive hands-on experience in full product lifecycle for software and database applications, including invention, architecture, implementation, and production in a wide variety of fields.
- Uncanny ability to intuit startlingly simple solutions to complex problems. Innovative problem solver -- can look at what others have looked at, and see what no one else has seen.
- Flexible and adaptable, comfortably handles multiple tasks at multiple levels simultaneously. Excellent communicator, interacts well at all levels of organization. Takes the initiative and is a team player.

*SKILL SET (strong intellectual curiosity, relentless self-educator, expert in many areas, uses the right tool for the job)*

| Datasets/sources | Limit order book/Level 2, TAQ, daily, Corporate Actions, SecurityMaster, order routing, order lifetime, peer group, Bloomberg, Comstock, NASDAQ, NYSE, direct market data feeds. |
|---|---|
| Languages | C/C++/STL, Java, C#, SQL, bash/ksh, Tcl/Tk, HTML, Perl/AWK/XSL/Python, JSP/PHP/ASP |
| Technologies | UNIX, TCP/IP/UDP/Sockets/JMS, J2EE/Struts, Swing/AWT, CORBA, ODBC/JDBC, XML, Servlets, SOAP, 3D/CAD, video/image processing, MFC/COM/ATL/.NET, JavaScript. |
| Methodologies: | OOA/D, UML, RUP, FDD, XP, Agile/Iterative, refactoring, Design Patterns. |
| Techniques | Multithreading, real-time, Distributed systems, Messaging/Queuing, n-Tiered, Adaptive algorithms/rules-engines, Data Warehousing/Mining, ETL, Knowledge Management, Content/Document management, SW/DB Architecture, time-series analysis, Statistics. |
| Tools/Products/OSs | Sybase-IQ/ASE/Oracle/Mysql, Power Builder, Together Control Center, JBuilder, MSVisual, Rational, many SCM, SAS, CPLEX, Matlab, all Win, many Unix, various Linux. |

*PUBLICATIONS*

*IIJOT--Journal of Trading, Summer 2006, Vol. 1 Num. 3*
Let's Play Hide-and-Seek: The Location and Size of Undisclosed Limit Order Volume (with M. Borkovec and R. Sinclair)

*EXPERIENCE*
Senior Research Analyst, Financial Engineering, Analytical Products Research, ITG Inc.   11/2003 - Present
***A leading quantitative agency brokerage for institutional traders.***

Leading several projects and technology initiatives in a group of 15, with 11 PhDs. Serving in a multiple role as research analyst, project manager, and quant application developer. Principal research areas include analysis of limit order book to discover/predict hidden liquidity, pre/post trade transaction cost analytics, and real-time analytics for algorithmic trading and order routing. Project management includes LOB engine and database initiative and core FE application engine/framework/db project. Quant application development applies to all of the above.

Managing the FE Development and Database group overseeing day-to-day production and ETL from multiple data vendors. Principal architect and designer for a completely new analytical application framework and process control system for the master equities trading database/data-warehouse (SecurityMaster, pricing, cax, and Level 2) including a large historical L2 dataset. (Historical data in excess of 12Tb + 4Tb/yr) This Object Oriented system, written in pure C++/STL and running on Solaris/Sybase (IQ and ASE)/EMC, serves as the core proprietary database engine and application environment for all new research and product initiatives in the Financial Engineering department including Limit Order Model, Fair Value Model, Risk Models, Transaction Cost Analytics and others.

Design and implementation of "event stream processing" engine for low latency handling of high frequency l2 market data. Created new models for data that permit high performance and throughput (including algorithms for real-time merging of direct exchange feeds and L2 consolidated book builder.) This scalable system allows for distributed parallel processing of real-time consolidated books for all listed and OTC US equities including real-time analytics for algorithmic trading and "smart" order routing.

Analytical processing on Plan Sponsor database which contains broker order lifetime information for 30% of the US trading volume (hundreds of billions of records), including clusterization and analysis of transaction cost for post-trade performance evaluation against various benchmarks.

Other various accomplishments:
- Implementation of trading strategy optimization problems in CPLEX.
- Design/Implementation of feeds-level unified trade and quote condition code database
- Design/Implementation of Production Incident Report database for SOX compliance.
- Analysis and design of new ACE model application for interlisted (USA/CAN) equities.
- Implemented new product: ACE Cost Curves.
- Implemented new product: Swing Pricing.

Principal Software Architect / Developer, GestureDesign LLC.  9/2002 – 11/2003
*A technology startup focusing on advanced computational geometry solutions.*

Invented and implemented prototype innovative computer interfaces for data visualization applications. Utilizing extensive skills in OOD and implementation, Java, Swing, TCP/IP & serial communications, C++/STL, NT/2000 internals, Linux, device programming, HW interfaces, and user interface design, created unique modes of 3D user interface for visualization and manipulation of large and complex datasets for use in a number of industries. Created unique freeform surface deformation and smoothing algorithms utilizing image processing techniques and advanced computational geometry.

Principal Architect (and developer), McCabe & Associates (True Software Inc.)    4/2001 - 9/2002
*A mature enterprise software development tools and SCM solutions company.*

Created a completely new, web-based, enterprise-level, distributed SCM and content management system to replace a very mature existing product.  Assessed the current TRUEchange product, market, competition (Clearcase et. al.), and customer requirements then devised a new and simple Object Oriented data model that satisfied present requirements and paved the way for future enhancements. Conceived, architected, designed, and implemented (almost single-handedly) an entirely new process-based SCM tool with unique features and very broad platform support.  Product design utilizes distributed system techniques enabling effective synchronization, transaction queuing, offline operation, scalability, security and fault tolerance while maintaining communication and transactional compatibility with legacy systems.  Utilized extensive background in systems architecture, OOD, document warehousing, Java, J2EE, Swing, C++, TCP/IP/UDP, and efficient database design to quickly implement a system with innovative features never seen before in the SCM market. Provided extensive training and mentoring on the architecture and data model of the system to facilitate an effective transfer to the software maintenance team.

Chief Architect / Developer / CTO, co-founder, Surgelink Inc.    1/2000 - 4/2001
*An Internet communications, messaging, and collaboration startup.*

Architect, inventor and developer for real-time Internet collaboration and communications software integrating a wide array of technologies and features. Independently carried this highly scalable n-tiered enterprise communications project from design through production utilizing C++, MFC, Java, J2EE, Swing, JMS, n-tiered and client/server architecture with distributed database and distributed computing techniques, TCP/IP, sockets, database design and implementation (SQL), COM, and advanced multithreading techniques. Product includes features such as internet chat, instant messaging, one-to-many/many-to-one interactive distance learning, remote application control, MS Agent technology, video capture, video pattern and feature recognition, built-in scripting languages, web server integration, co-browsing, public key based security, low level client-server communications, public chat channels, speech synthesis/recognition, online training sessions, online test administration and more.

Principal Consultant, co-founder, Sculptware LLC     1996-2000
*A VRML software startup, spin-off from Cadkey Inc.  Subsequently a software/technology consulting firm.*

Created a new virtual reality modeling product based on core CAD software from Cadkey. This product has a code base of more than one million lines of C/C++ code. Changed the overall look and feel of the user interface and implemented many new features specific to the requirements of virtual reality modeling such as animation and texture mapping and automatic levels of detail.  Reverse-engineered and implemented a web browser plug-in interface to allow browser plug-in capability to the tool.

Successfully negotiated complex contracts, relationships and source code licenses with multiple parties to secure the technology needed to launch the company.  When the market for VRML tools never materialized, converted company to consulting practice.

*In a consultation capacity through Sculptware LLC, completed the following projects:*

*E*Trade Inc.* (Leading online brokerage), *Contracted to design OLCS system* – Performed architecture, database, and file system design for the Online stock trade Confirmations and Statements System (OLCS) for E*Trade Inc. Drawing on experience creating efficient custom databases, real-time code optimization, and a wide variety of platform experience, designed a new framework including software and hardware specifications to significantly improve performance over an original planned implementation.  Designed a system for handling (intercepting) EOD stock trade transaction confirmations electronically without interrupting current data streams for paper generation. Performed load simulations and analysis to assess scalability issues.  Established automated data warehouse procedures for data/document availability and retirement.  Established an electronic document workflow process that had minimal intrusion on current back-office operations, and maintained security and integrity of data.

*New River Investor Communications Inc. (Financial services to brokerage and mutual fund industries) - Contracted to automate production system.* -- Significantly automated electronic document handling and conversion processes for NRI's Digital Direct II product.  Drawing on knowledge and expertise of existing domain experts, identified broad sets of general features that could be reduced to sets of simple rules.  Utilized Knowledge Management techniques, NLP, database design, Korn shell, AWK, C++, Java and HTML to create a rules-based

system to extract mutual fund documents and automatically convert them from ASCII and PDF to HTML including tables of contents and financial tables. Reduced person-hours per document from more than fifty to less than three! This efficiency made the DD2 product profitable for the first time in its history and saved it (and possibly the company) from the scrap heap. This new system was regularly showcased as NRI's "advanced technology" to customers, potential customers, and strategic investors.

*New River, Contracted to create data-warehouse QC system.* – Created a quality control verification system for NRI's Prospectus-Net product. The product is intended to provide accurate SEC compliance documents to mutual fund shareholders. The only QC method at the time was to check the system against itself. (Go figure!) Created a parallel system for data-mining the SEC's EDGAR database to extract and present current mutual fund documents for verification. Utilized C++, custom adaptive rules-engine, internet protocols, dynamic web reports, Korn shell, AWK, CRiSP, document warehousing, SQL, web servers, extensive CGI(c++, shell, perl), Java, KM, NLP, and GUI interface design to create a QC system that was more efficient for gathering documents than the subject system.

*Distance Engineering Inc., Contracted to create engineering software collaboration tools.* – Implemented numerous innovative techniques to allow application sharing of multiple remote CAD systems. Implemented complex data synchronization schemes to assure consistency of data and minimize data throughput. Utilized extensive knowledge of C++, TCP/IP, multithreading techniques, custom compressed communication protocols and a deep understanding of the problem domain to produce a new and innovative product to improve productivity, communication, and collaboration in a design-engineering environment.

*eList.com/NewMediary.com*, (Leading B2B web-Portal) - *Contracted to create architecture for B2B portal.* – Architecture and database design (pure architecture, no code) for a narrow-market b2b and yellow pages startup that was subsequently funded as Newmediary.com. Evaluated current technology and trends including new J2EE frameworks. Proposed an innovative approach to database organization and storage that simplified the overall implementation of their web-based applications.

*Learning Sites Inc. (Interactive Historical Reconstructions) - Contracted to create user interfaces and database tools* – Created interfaces and custom controls for educational products for Learning Sites Inc. LSI creates digitally reconstructed archeological sites using VRML and needed to overcome some of the limitations imposed by standard VRML browsers. Utilizing Java, EJB, JavaScript, VRML, 2D/3D graphics, and HTML, created controls that extended the browser's capabilities significantly and provided direct links to database information for artifacts contained in the worlds. The products are unique and powerful, implementing communication controls between applets, browsers, browser plug-ins, and archeological databases.

*Learning Sites Inc. Contracted to create an archeological excavation simulation game* – Created a complete simulation system that allows students to supervise a recreation of an actual Nubian palace excavation. Extremely tight OOD and clever implementation allows the game to be completely driven by external data including inventory management of artifacts, tools, experts, budgets, time constraints and random events. Utilized OOD, Java, and streamlined DB design techniques to rapidly produce this extensible simulation platform.

*Baystate Technologies Inc. (Leading CAD Software provider) - Contracted to convert complex application from SDI to MDI.* – Converted Cadkey for Windows from Single Document Interface to Multiple Document Interface. Utilized deep understanding of software applications architecture to rework a large-scale and complex CAD product to allow multiple part databases to coexist simultaneously in the application. Segregated session specific and database specific data/classes/structures and designed and implemented methods for maintaining persistence of all data types. Project relied heavily on C/C++ for core functionality and MFC for user interface. Also improved efficiency of complex mathematical procedures and streamlined obtuse sections of code so that junior programmers could more readily understand them.

*Baystate Technologies Inc. Contracted for other custom programming.* –
- Created custom version control system utilities and significantly reworked the custom make executable and make system to streamline the build and release process. Utilized Korn shell, AWK, YACC, C/C++, CVS and a thorough knowledge of build tools to implement this solution.
- "Silver bullet" debugging of the most evasive software problems imaginable. When the development team was at wits end and just couldn't solve a given problem they would reassign the SPR to "bongi". Transient, elusive, memory klobbering, insidious, display list bitbliting, Heisenbergian, stack frying, heap corrupting, bugs, bugs, bugs were all killed. Dead. Dead. Dead!

Senior Software Specialist / Project Manager, Cadkey Inc.     1989-1996
**A leading supplier of 3D computer aided design software products.**

Chief architect, designer, and developer of the Advanced Modeler hybrid solid/surface/wire-frame product as well as manager of the AM team. Designed and implemented NURB surface and solid modeling. Created unique, highly efficient, "fuzzy", adaptive-iteration variable radius fillet routines using C/C++ and genetic algorithm techniques.

]Closely involved in all aspects of large-scale (over one million lines of platform-portable code) software product development cycles from concept through completion, commercialization, and resurrection. Primarily C/C++, Object Oriented Design, and proprietary database design and construction in a multi-platform environment.

-11-

Principal technical contact for Fanuc Ltd. (Japan) CAD-DIE team. Chief architect of the Open Systems used in the implementation of their PC based CAM system. Provided extensive training on surface/solid modeling technology, and provided continuing technical support for their product development team. Lived in Tokyo for seven months and spent three additional months teaching C/Cadl programming seminars throughout the Pacific Rim in 1989.

Principal technology investigator for mergers, acquisitions, and significant licensing arrangements. Frequently called upon to perform technology due-diligence for potential acquisitions and joint ventures. Assessed technological level of potential partners, practicability of technology convergence, and evaluated strategic importance of potential deals from a technology perspective. In this capacity, continually remained current in new technologies and trends including the commercialization of the Internet and the emergence of Java.

Principal Engineer, founder, Procyon Inc.     concurrent 1989-1998
*A mechatronics engineering research and development company.*

Invented, designed, and produced several high technology mechatronics products including an innovative large-scale laser-based 3-dimensional digitizer. Full responsibility for managing a team of creative engineers (EE and Mech). Responsible for all development activities from concept to productization. All products have heavy emphasis on real-time software and firmware systems integration on PC's, 68HC11k, and other embedded systems.

Implemented sophisticated reverse-ramp fuzzy logic and genetic algorithms for control of micro-miniature motors in a high speed targeting gimbals device. Utilized rapid data acquisition and interpolation to provide smooth motion in a difficult and unpredictable control environment. Utilized C++, C (Archimedes), serial, multithreading, asm, and PIC programming to implement these advanced tools on a proprietary embedded control board and PCs. Linked entire system to multiple CAD system APIs (mechanical and architectural) to provide real-time visualization of data.

Principal Engineer / President, Procyon Manufacturing and Engineering Inc.     1980-1989
*An aerospace engineering, research, and prototype manufacturing company.*

Started at entry-level, advanced rapidly, offered full partnership to prevent a school transfer to MIT. Eventually had full charge of all company operations. Involved in all aspects of custom software/systems development and electromechanical assembly manufacturing.

Developed custom embedded firmware and software for real-time process control systems for aerospace, defense, and medical applications. Utilized C (prior to ANSI), C++(yes, back in the AT&T days), and other languages best forgotten, to develop a number of small scale custom solutions for manufacturing and process control applications as well as some large scale projects for other applications. Platforms included UNIX, VAX, PC, and custom embedded systems.

Implemented program to calculate, using ray-tracing algorithms, the deformation of a pilot's line of site for aircraft canopies of poly-laminate materials. Utilized knowledge of complex spline-surface mathematics, C, assembler, and numerical analysis to create this cutting edge tool that helped validate new aircraft shape design.

Utilized in-depth knowledge of Geometric Dimensioning and Tolerancing (ANSI-Y14.5) to validate complex assemblies for aerospace applications. Created custom software in C/C++, assembler, and embedded devices, for representing GDT data and controlling NC-CMMs for automated inspection.

Implemented complex real-time process control software for dynamic industrial systems applying ITO thin film coatings to aircraft canopies. Utilized conventional multivariate analysis and invented unique adaptive evolutionary algorithms to solve nearly intractable real-time dynamics problems. Application of these techniques increased reliability of process and reduced operating costs significantly.

*EDUCATION*
Cypress College: Physics and Applied Mathematics -- GPA: 3.93/4.0
   Transfer to Massachusetts Institute of Technology canceled after accepting full partnership in Procyon. (See above)
   Presidents Honor roll, Deans List, included in Who's Who Among Students in American Colleges.

*OTHER*
US citizen